# CASSIUS M. STRADER *et al.*

*v.*

# BENJAMIN T. SNYDER.

1. PLEADING—*demurrer—to what pleas directed.* To an action on the case for libel, the defendants pleaded the general issue and two special pleas. The plaintiff demurred to two of the pleas, describing them as pleas *one* and *two*, and assigning as cause of demurrer that they amounted to the general issue. The court sustained the demurrer to the two special pleas, which were the second and third of the series, and this was assigned for error: *Held,* that the decision was correct, as the court will always look at the body of any pleading for the purpose of determining its character, and to what it is directed.

2. SAME—*when plea amounts to the general issue.* A plea in an action on the case for libel, purporting to answer the whole cause of action, where the justification attempted to be set up is not as broad as the imputation upon the plaintiff's character, and which consists principally in mere denials of allegations of the declaration, either directly or argumentatively, is bad on demurrer, as amounting to the general issue.

3. EVIDENCE—*secondary in case of libel.* It is erroneous to admit in evidence a libelous article from a newspaper, in a suit against the parties who wrote the original and procured its publication, even though it was published substantially according to the manuscript. The original should be produced, or its absence accounted for. But if the defendants afterwards put in evidence such original, the error will be cured.

4. LIBEL—*variance in the written article and that as printed.* In a suit against the author and those procuring the publication of a libelous communication in a newspaper, it appeared that the article, as published, contained some slight verbal alterations from the manuscript, but not such as to alter the sense. The court refused to instruct the jury that, unless the phraseology of the two were the same, there could be no recovery: *Held,* no error, as a mere verbal alteration, not affecting the sense, would not exonerate the defendants. To have that effect the alterations must be material. The materiality of the manuscript as evidence was only upon the question of agency of the defendants in procuring the publication.

5. EVIDENCE—*when objection to, should be specific.* In a suit for libel, where the defendants had gone extensively into parol and secondary evidence of the contents of the original manuscript article which had been published, and which was in their possession, the plaintiff called a witness who had seen the original, and who testified to its contents without objection, and asked him: "Did you understand who this article referred to?" The defendants objected generally to the question, but the court allowed it to be answered, and the witness said he thought it referred to the plaintiff: *Held,* that as the defendants had introduced much similar evidence, they should have objected specially, and then the objection might have been obviated by notice to produce the original.

6. SAME—*in mitigation of damages in libel—reputation of plaintiff.* On the trial of a suit for libel imputing adultery to the plaintiff with a negro woman, the general issue alone being filed, the defendants offered to prove, in mitigation of damages, that, before and at the time of publishing the alleged libel, the plaintiff was generally reputed and believed among his neighbors to be the father of the colored child referred to in the article: *Held,* that such evidence was not admissible under the general issue, for any purpose.

7. LIBEL—*whether words impute adultery.* In a suit for libel, the words set out were: "We see in the columns of the Macomb Journal, of the 24th, an article under the blood and thunder heading of 'Middletown Mass Meeting, and excitement over the burial of a colored child.' 'A fight proposed, and the wilting down of the belligerents.' The colored child in question is supposed to be the offspring of a Mr. Snyder, formerly of Macomb. The Journal article, from beginning to end, is a wilful lie. The author says the meeting was held in a blacksmith shop—a lie! The truth is, Snyder lied to get his 'miscegen' in the graveyard, and when this was found to be the case, the citizens of Middletown, both republicans and democrats, met at the graveyard to investigate the matter, and the circumstances showed that Mr. Snyder, with ridiculous intentions, had misrepresented the facts concerning the child, and thereby obtained permission to bury his illegitimate 'production' in our burying ground."

*Held,* that the words did not, in their common acceptation, and without the aid of extrinsic matters, impute to the plaintiff an act of adultery, much less with the negro woman to whom they were alleged to apply.

8. SAME—*pleading and evidence—when the allegations must be strictly proven.* In an action for libel, where the words are not actionable *per se,* but are in connection with extrinsic matters which are set forth in the declaration, such matters are material, and the allegation that the slander applies to such extrinsic matter, is matter of description, and must, in general, be proved as laid, though unnecessarily minute.

9. Where the plaintiff introduces into his declaration for libel or slander extrinsic matters, and alleges that the words set out applied to them, in order to support his *innuendo* he is bound to prove such matters, and show the application as alleged.

10. SAME—*office of innuendo.* The office of an *innuendo,* in actions for slander and libel, is to ascribe a particular meaning to the words complained of, and such meaning becomes a part of the issue and material, so that the plaintiff can not, on the trial, reject such meaning and resort to another.

APPEAL from the Circuit Court of McDonough county; the Hon. CHAUNCEY L. HIGBEE, Judge, presiding.

This was an action on the case, by Benjamin T. Snyder, against Cassius M. Strader, Robert Myres, and Richard Cracraft, for a libel. The facts of the case appear in the opinion. A trial was had in the circuit court, resulting in a verdict and judgment in favor of the plaintiff for $215, and the defendants appealed.

Mr. S. CORNING JUDD, for the appellants.

Mr. D. G. TUNNICLIFF, for the appellee.

Mr. JUSTICE MCALLISTER delivered the opinion of the Court:

This was *case,* brought in the McDonough circuit court by appellee against appellants, for an alleged libel published in a newspaper called the "Macomb Eagle," as it is claimed by the procurement of appellants, and imputing to appellee

the charge of adultery with a negro woman, particularly described. The declaration contained four counts, each setting forth certain introductory matter to support the *innuendo* of adultery, as above stated, setting out the words, and averring that the words set out applied to such introductory matter, which were followed by said *innuendo.* The pleas were, the general issue and two special pleas in justification. To the special pleas a demurrer was interposed, which was sustained, and the case tried upon the general issue. Verdict and judgment for plaintiff, and appeal taken by defendants to this court.

The first error assigned questions the correctness of the decision of the court in sustaining the demurrer, on these grounds: (1), the demurrer did not extend to both special pleas, and the court sustained it to both; (2), the pleas were both sufficient in law. Neither of these grounds is tenable. It is true, in the commencement of the demurrer the pleas are described as *one* and *two,* and, in the order of filing, the general issue was first. But the special cause assigned was, that said pleas, and each of them, amounted to the general issue. The court may always look at the body of any pleading for the purpose of determining its character, and to what part of the pleadings it is directed. As the only cause of demurrer specified was, that the pleas, and each of them, amounted to the general issue, and as no rational pleader would assign that cause in a demurrer to the plea of general issue, the court applied the demurrer to the special pleas, and defendant's counsel acquiesced by not objecting, and going to trial upon the general issue. This objection we regard as frivolous. The pleas were so clearly bad, that we shall not stop to analyze them. They purported to be an answer to the whole cause of action, and the justification attempted to be set up was not as broad as the imputation upon plaintiff's character, and they consist principally in mere denials of allegations of the declaration, either directly or argumentatively, which amount to the general issue.

The next point made is, that the court permitted plaintiff's counsel to read the newspaper in evidence without first producing the original manuscript from which it was published. The defendants were in no way connected with the newspaper establishment. The article in the paper purported to be a communication signed by each of defendants. The evidence tends to show that Cracraft, one of the defendants, prepared, for the purpose of publication, a manuscript, which the other two defendants signed, and Cracraft put it into the hands of Dr. Fugate to copy, with directions to sign his, Cracraft's, name to it when copied. The evidence tends to show that this was done, and the manuscript, so copied, was sent to the editor of the paper, and that the other defendants admitted that they had signed it. Evidence was also given tending to show that, in setting up the article, there were changes made in the phraseology, but none altering the sense in respect to the alleged libelous words. It also appeared that the defendants' counsel had the manuscript in their possession at the trial, and afterwards introduced it in evidence. But they have not preserved it in the bill of exceptions.

In *Adams* v. *Kelly*, Ry. and Mo. N. P. C. 157; 20 E. C. L. 403, where a reporter to a newspaper proved that he had given a written statement to the editor of the paper, the contents of which had been communicated to him by the defendant for the purpose of such publication, and that the newspaper then produced was exactly the same, with the exception of some slight alterations not affecting the sense; it was held that what the reporter published in consequence of what passed with the defendant, might be considered as published by the defendant, but that the newspaper could not be read without producing the written account delivered by the reporter to the editor. This rule is entirely conformable to the general rule of evidence, and goes upon the ground that what the reporter stated as to the article in the newspaper being exactly the same was secondary evidence, while his written

account was the higher and better evidence, and should be produced. That rule would apply here, but we think the subsequent production of the manuscript by the defendants cured the error. *Deshler* v. *Beers*, 32 Ill. 368.

As connected with this branch of the case we will here notice another point relied upon below and strongly urged here. Defendants' counsel asked the court to charge the jury, in substance, that unless the words and phraseology of the manuscript were identically the same as in the newspaper article, there could be no recovery. This instruction was refused, and, we think, properly. The action was brought for the words published in the newspaper, not those in the manuscript. The materiality of the latter as evidence was only upon the question of the agency of the defendants in the procurement of the former; in short, it was for the purpose of showing that the newspaper article was published in consequence of the production by the defendants of the manuscript for the purpose of being published. In this view, mere verbal alteration, not affecting the sense, would not exonerate. To have that effect the alterations must be material. We have not been able to find any case exactly parallel, but in *Rex* v. *Hall*, 1 Strange, 416, the principle is clearly recognized. That was an information for a libel; the witness for the crown produced the libel and swore that it was shown to the defendant, who owned himself the author of the book, *errors of the press and some small variations excepted.* The counsel for the defendant objected that this evidence would not entitle the Attorney General to read the book in evidence, because the confession was not absolute, and, therefore, amounted to a denial that he was the author of that *identical* book. But PRATT, Ch. J., allowed it to be read, saying he would put it upon the defendant to show that there were *material* variances.

The manuscript not having been preserved in the bill of exceptions, we can not determine whether there were, in fact,

material variances, but the court was right in refusing to instruct that the words and phraseology must be identically the same as in the newspaper.

The plaintiff introduced one Vorhees as a witness, who testified that he saw the manuscript in Dr. Fugate's hands and read it. He could not say that it was the same as that in the newspaper. His best recollection was that it was about the same. All this was admitted without objection, and the following question was asked: "Did you understand who this article referred to?" To this, defendants objected generally, and the court overruled the objection. Witness answered: "I think it referred to the plaintiff, Mr. Snyder." It is now insisted that the exception taken to this evidence should have been sustained. This question called for the witness' understanding of the manuscript, which had not been produced nor its non-production accounted for in any legal way. But it was, in fact, in the possession of the defendants, who had already gone extensively into parol and secondary evidence of its contents. Having done so, they should have objected specially when plaintiff introduced the same kind of evidence. Then plaintiff's counsel might have given them notice to produce the manuscript, which was in their possession at the trial, and they would have been compelled to produce it or submit to the introduction of secondary evidence of its contents.

The defendants offered to prove, in mitigation of damages, that, before and at the time of publishing the alleged libel, the plaintiff was generally reputed, and believed among his neighbors, to be the father of the colored child in question. Upon objection by plaintiff's counsel, the offer was excluded and exception taken. This is relied upon as error. It is the settled law of this court that such evidence is not admissible, under the general issue, for the purpose of mitigating damages, or any other purpose. *Young* v. *Bennett*, 4 Scam. 43; *Regnier* v. *Cabot*, 2 Gilm. 34; *Sheahan* v. *Collins*, 20 Ill. 325.

Opinion of the Court.

The portion of the newspaper article containing the words set out in the several counts of the declaration, and read in evidence by plaintiff, is as follows: .

"For the Macomb Eagle.

"FROM MIDDLETOWN—THE OTHER SIDE OF THE STORY—THE COLORED⋅ TROOPS FOUGHT NOBLY.

"MIDDLETOWN, ILL., June 27, 1870.
*"Editor Macomb Eagle:*

"We see in the columns of the Macomb Journal of the 24th, an article, under the blood and thunder heading of ' Middletown mass-meeting, and excitement over the burial of a colored child—A fight proposed, and the wilting down of the belligerents.' The colored child in question is supposed to be the offspring of a Mr. Snyder, formerly of Macomb. The Journal article, from beginning to end, is a wilful lie. The author says the meeting was held in a blacksmith shop —a lie ! The truth is, Snyder lied to get his ' miscegen ' in the graveyard, and when this was found to be the case, the citizens of Middletown, both republicans and democrats, met at the graveyard to investigate the matter, and the circumstances showed that Mr. Snyder, with ridiculous intentions, had misrepresented the facts concerning the child, and thereby obtained permission to bury his illegitimate ' production ' in our burying ground."

As we have before said, the declaration in each count, for the purpose of applying the alleged defamatory words, and to support the innuendo that they meant to impute a charge of adultery on the part of plaintiff with a particular negro woman, set out, as extrinsic and introductory matters, in substance, the following : That, at the time when, etc., the plaintiff was a married man, living with his wife, who was a white woman, and having white children as the issue of such marriage; that, at said time, when, etc., and for several weeks before, he had in his employ as a servant, doing housework, a certain negro woman who was not, and never was, his wife,

and that said negro woman, at the time she came into such employment, had with her a certain negro child of tender age, to wit: of the age of two years, not the child of plaintiff, but which said negro woman claimed as her child, and which child said negro woman kept at plaintiff's house until shortly before said time, when, etc.; when said child died and was buried in a graveyard in plaintiff's neighborhood, near the town of Middletown; that, after such burial, and before said time, when, etc., there had been a meeting of the citizens in the neighborhood, and an article was published in the Macomb Journal, a newspaper published in said county, of and concerning said meeting of said citizens, and headed "Middletown mass-meeting, and excitement over the burial of a colored child—a fight proposed, and the wilting down of the belligerents."

The declaration then proceeds in each count to set out the alleged libelous words and apply them to said several extrinsic matters, following with the innuendo that plaintiff was guilty of adultery with said negro woman.

Where an averment of extrinsic matter is material, the allegation that the slander applies to such extrinsic matter is matter of description, and must, in general, be proved as laid, though unnecessarily minute.  1 Chit. Pl. 401; 1 Greenlf. Ev. sec. 58; 3 ib. sec. 413.

It is quite too plain for argument, that the words set out do not, in their common acceptation, and without the aid of the extrinsic matters, impute to plaintiff an act of adultery, much less with the negro woman to whom they are alleged to apply.  *Patterson* v. *Edwards*, 2 Gilm. 720.

The court below refused all instructions asked by the respective parties, and, of his own motion, gave the following:

"The words set out in the declaration amount to a charge of adultery, or fornication, and are actionable; and if the jury believe, from the evidence, that the defendants caused or procured the article published in the Macomb Eagle, and read

in evidence, to be published in said paper, and that the same was published in reference to the plaintiff, and if no subsequent part of said article read in evidence by defendants so qualified said article as to show that said *crime* of adultery or fornication was not intended to be imputed, then the law would imply motive, and the plaintiff would be entitled to recover at least nominal damages."

The direct effect of this instruction was to relieve the plaintiff from the necessity of proving, and the jury from passing upon the extrinsic matters introduced, to which the declaration alleged that the words set out applied, and to allow the plaintiff to resort to another meaning to such words than that ascribed by his innuendo. This was a departure from well established rules. The plaintiff having introduced such extrinsic matters, and alleged that the words set out applied to them, in order to support his innuendo, was bound to prove such matters and show such application as laid and alleged. And having, by his innuendo, ascribed a particular meaning to the words, he was not at liberty to reject that meaning upon the trial, and resort to another. The innuendo gave a character to the libel, which became a part of the issue. *Stowell* v. *Beagle*, 57 Ill. 97.

For this error the judgment must be reversed and the cause remanded.

*Judgment reversed.*